O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE LUIS PADILLA,

       Petitioner,

  v.

MARION E. SPEARMAN, Warden,

       Respondent.

Case No. 2:19-cv-00526-KES

MEMORANDUM OPINION
AND ORDER

## I.

## INTRODUCTION

In January 2019, Jose Luis Padilla ("Petitioner") filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court conviction for aggravated mayhem arising out Petitioner's stabbing his long-time acquaintance, Ramiro Ramirez, in the neck. (Dkt. 1 ["Petition"].) Petitioner is serving a sentence of 19 years to life. (Dkt. 1 at 2.[1]) For the reasons discussed below, the Petition is DENIED.

---

[1] All page citations to lodged or filed documents use the pagination imposed by the Court's electronic filing system, except for citations to the Clerk's Transcript ("CT") and Reporter's Transcript ("RT").

## II.

## FACTUAL BACKGROUND

The underlying, italicized facts are taken from the unpublished California Court of Appeal decision on Petitioner's direct appeal.  (Dkt. 10, Lodged Document ["LD"] 6); <u>People v. Padilla</u>, No. B266269, 2017 Cal. App. Unpub. LEXIS 7926 (Nov. 17, 2017).  Unless rebutted by clear and convincing evidence, these facts may be presumed correct.  <u>Tilcock v. Budge</u>, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1).

*Ramirez lived in a converted garage in Pico Rivera.  He and Padilla, whom he knew as "Wicked," had known each other for about 20 years.  [FN 2: Ramirez passed away prior to trial.  The prosecution read his preliminary hearing testimony to the jury.]  On the night of May 23, 2014, the two were together at Ramirez's home when Padilla became upset over seeing a photograph of his "girl" on Ramirez's cell phone.  Padilla left and Ramirez went to bed around 2:00 a.m.  He woke up between 11:30 a.m. and noon when his friend Rubin knocked on the door.  They spoke briefly, and Ramirez went back to bed.  As Rubin left, Padilla was on his way over to see Ramirez.  Rubin and Padilla passed by each other on their respective ways.*

*About 30 seconds after Rubin left, Padilla knocked on Ramirez's door.  Ramirez let him in.  Ramirez told Padilla he was going to take a nap, and Padilla asked if he could stay and "kick back a bit."  Padilla asked to use Ramirez's cell phone.  Ramirez gave him the pass code to unlock the phone.  Ramirez went back to bed.  He was facing the wall with his back to Padilla.*

*Roughly five to seven minutes later, Ramirez felt something "gouge" his neck.  He looked up and saw Padilla, who had a "wild crazed look in his eyes."  Padilla did not say anything and went out the door.  Ramirez got up, looked in the mirror, and saw a "big ol' gap" in his neck.  He applied a towel to his neck to stop the bleeding.*

Ramirez went to the main house and told the people there that "Wicked" had cut him.  Roughly 15 minutes later, a deputy from the Los Angeles County Sheriff's Department and an ambulance arrived.  Ramirez told Deputy Tim Shultz that "Wicked" had attacked him.  Ramirez provided Deputy Shultz with a physical description of "Wicked."  Ramirez was then taken to the hospital.

At the hospital, the hole in Ramirez's neck was stapled closed.  The attack left "a three- to four-inch scar on the left side of the throat below the jawline."

Ramirez kept a folding knife on a dresser near his bed.  On one side of the blade was a straight razor and on the other side the blade was serrated.  When he returned from the hospital, Ramirez discovered both his knife and cell phone were missing.  He told the sheriff's department his knife and cell phone had been stolen.

On May 25, Deputy Kenneth Felix, while responding to a disturbance call, saw an individual matching Ramirez's description of "Wicked."  Deputy Felix arrested this individual, who turned out to be Padilla.  When asked what name he went by on the street, Padilla responded, "Wicked."

Shortly thereafter, Detective Cuouhtemoc Gonzalez was assigned to the case.  Detective Gonzalez interviewed Ramirez and learned about the missing phone and knife.  The Detective obtained a search warrant for the residence where Padilla had been arrested.  The deputies executing the warrant found Ramirez's cell phone inside the residence.  (LD 6 at 2-4.)

### III.

### PROCEDURAL HISTORY

A.  <u>**Trial Court Proceedings.**</u>

Petitioner was originally charged by information with attempted willful, deliberate and premeditated murder under California Penal Code ("PC") sections 187(a) and 664.  (CT 26-29.)  The aggravated mayhem count under PC section 205 was added by amended information.  (CT 52-56.)  The amended information alleged that Petitioner personally used a deadly or dangerous weapon and inflicted

3

great bodily injury in committing the charged crimes under PC sections 12022(b)(1) and 12022.7(a). (Id.) It also alleged that Petitioner had suffered a prior serious felony conviction (per PC § 667(a)) constituting a strike within the meaning of the three strikes law (PC §§ 667(b)-(i) and 1170.12) and served a prior prison term (per PC § 667.5). (Id.)

A jury found Petitioner not guilty of attempted murder and guilty of aggravated mayhem. (CT 85-86.) It found true the allegations that he personally used a deadly or dangerous weapon and inflicted great bodily injury in the commission of the crime. (Id.) Petitioner admitted a prior serious felony conviction and a prior prison term. (3 RT 936-37.) The trial court sentenced Petitioner under California's three strikes law to 14 years to life, plus 5 years for the prior serious felony. (3 RT 1205; CT 126-27.) The court struck the weapon use, great bodily injury, and prior prison term findings for purposes of sentencing. (3 RT 1205.)

**B.    Appellate Proceedings.**

Petitioner appealed, raising four issues. (LD 3.) The Court of Appeal affirmed the trial court's judgment in all respects. (LD 6.) The California Supreme Court summarily denied review. (LD 8.) Petitioner did not file any collateral challenges in state court. (Dkt. 1 at 3.)

**IV.**

**CLAIMS**

Petitioner asserts the same four grounds for federal habeas relief that he raised on direct appeal, attaching his counselled appellate briefing to his Petition:

Ground One: The prosecutor improperly used his peremptory challenges to excuse two African-American jurors. (Dkt. 1 at 21.)

Ground Two: There is insufficient evidence of intent to maim, an element of the crime of aggravated mayhem. (Id. at 28.)

Ground Three: There is insufficient evidence of the assailant's identity,

4

because Ramirez did not see who stabbed him.  (Id. at 32.)

Ground Four: The prosecutor engaged in misconduct by, among other things, improperly urging the deadlocked jury to reach a "compromise" verdict by acquitting on count 1 but convicting on count 2.  (Id. at 36.)

# V.

# STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Petitioner is entitled to federal habeas relief only if the state court's decision on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

The relevant "clearly established Federal law" consists of only Supreme Court holdings (not dicta), applied in the same context that petitioner seeks to apply it to, existing at the time of the relevant state court decision.  Premo v. Moore, 562 U.S. 115, 127 (2011).  A state court acts "contrary to" clearly established Federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  A state court "unreasonably appli[es]" clearly established federal law if it engages in an "objectively unreasonable" application to the facts of the correct governing legal rule.  White v. Woodall, 572 U.S. 415, 425 (2014) (rejecting previous construction of section 2254(d) that a state court decision involves an unreasonable application of clearly established Supreme Court law if the state court "unreasonably refuses to extend a legal principle to a new context where it should apply").  Habeas relief may not issue unless "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the United States Supreme Court's] precedents."  Harrington v. Richter, 562 U.S. 86, 103 (2011).

"[T]his standard is 'difficult to meet,'" Metrish v. Lancaster, 569 U.S. 351, 358 (2013), as even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable," Richter, 562 U.S. at 102.

The relevant state court decision is the last reasoned decision. Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991). The federal court "looks through" subsequent unexplained decisions, presuming that those decisions denied relief on the same grounds as the last reasoned decision. Id. at 804. Here, all claims were exhausted on direct appeal, making the Court of Appeal's decision (LD 6) the relevant state court decision for purposes of federal habeas review.

## VI.

## DISCUSSION

**A.**      **Ground One: Batson/Wheeler Claim.**[2]

**1. Clearly Established Federal Law.**

The parties to a California criminal trial can challenge an unlimited number of prospective jurors "for cause" by arguing that the juror does not possess the necessary qualifications to serve. Cal. Code. Civ. Pro. § 228-29; People v. Black, 58 Cal. 4th 912, 916 (2014). The parties also have a limited number of "peremptory" challenges to prospective jurors. Cal. Code. Civ. Pro. § 231(c). Peremptory challenges are ordinarily exercised without a stated reason. Wheeler, 22 Cal. 3d at 283-84. However, the Equal Protection Clause forbids using peremptory challenges to exclude potential jurors solely on the basis of race. Batson, 476 U.S. at 89; see also Wheeler, 22 Cal. 3d at 283-84. During voir dire, therefore, a party can make a Batson motion in response to the other party's use of a peremptory challenge, and that motion triggers certain duties incumbent upon the

---

[2] Batson v. Kentucky, 476 U.S. 79 (1986) (holding race-based exclusion of jurors violates criminal defendant's rights under Equal Protection Clause); People v. Wheeler, 22 Cal.3d 358 (1978) (same).

trial court.

Trial courts must follow three steps in adjudicating claims of racial discrimination during voir dire:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Snyder v. Louisiana, 552 U.S. 472, 476-77 (2008) (alterations omitted).

"[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. California, 545 U.S. 162, 170 (2005). The defendant must show that "the totality of the relevant facts" gives rise to that inference. Batson, 476 U.S. at 93-94.

> To establish such a case, the defendant must first show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Avery v. Georgia, 345 U.S., at 562, 73 S.Ct., at 892. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96.

At Batson's first step, whether the defendant has made a prima facie showing

of discrimination is a "mixed question of law and fact," and the trial court's finding is therefore accorded a "presumption of correctness" in the habeas context. Crittenden v. Chappell, 804 F.3d 998, 1006 (2015); see also Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) ("A trial court's determination of whether a prima facie case of discrimination under Batson has been established is to be reviewed deferentially, on direct review for clear error, or in the habeas context, by application of the statutory presumption of correctness.").

At the second step of the Batson inquiry, i.e., once a prima facie case has been shown, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation" for the strike. Purkett v. Elem, 514 U.S. 765, 767 (1995). That explanation need not be "persuasive, or even plausible." Id. at 768. "'[T]he issue is the facial validity of the prosecutor's explanation' and '[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Id. (citation omitted).

The third step of the Batson inquiry "requires the trial court to judge the persuasiveness of the prosecutor's explanation to determine whether the defendant has ultimately satisfied the burden of proving racial discrimination in the prosecutor's exercise of peremptory challenges." Murray v. Schriro, 745 F.3d 984, 1003 (9th Cir. 2014); Purkett, 514 U.S. at 768. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Miller-El, 537 U.S. at 339 (citation omitted). The issue turns on whether the trial court finds the prosecutor's race-neutral explanations to be credible. Id.; see also Murray, 745 F.3d at 1003. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Miller-El, 537 U.S. at 339. Under AEDPA, a habeas petitioner may obtain relief only by showing the state court's conclusion that the prosecutor's race-neutral explanations were true to be "objectively

unreasonable in light of the evidence presented in the state-court proceeding." Id. at 340 (quoting 28 U.S.C. § 2254(d)(2)).

Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. Hernandez v. New York, 500 U.S. 352, 359 (1991).

## 2. Relevant Trial Court Proceedings.

The venire panel consisted of 30 prospective jurors. (2 RT 2.) Each side had 20 peremptory challenges to use. (2 RT 13.) The trial court conducted general background questions of the entire panel. (2 RT 24-97.) Juror No. 10 was single, lived alone in Culver City, and was a senior technical services specialist, working for a medical laboratory and dealing mainly with physicians. (2 RT 47-48.) While she had previously served on a civil jury, the jury did not reach a verdict. (2 RT 48.) Juror No. 10 indicated that if she were not convinced by the evidence of the defendant's guilt beyond a reasonable doubt, then she would not vote to convict. (2 RT 71.) She could be impartial with respect to law enforcement and non-law enforcement witnesses. (2 RT 83-84.)

While pre-instructing the jury panel regarding the prosecution's burden of proof beyond a reasonable doubt, the court "tested" the jurors on various scenarios, including one in which the prosecution presented only one witness who was convincing. (2 RT 34-36.) When one juror indicated that his verdict in that case would be guilty, the court responded: "Absolutely correct. That is what you will be required to do based on the evidence that is presented in this trial during the sessions that we are in trial, nothing else. Ladies and gentlemen, you get what you get, not what you want to get, not what you think you will get, not what you would like to see. You get what you get, and based on that decision that is what you are going to view, you are going to decide guilty or not guilty." (2 RT 36.) The court went on to explain that Petitioner was not obligated to present any evidence but can

9

simply hold the prosecution to its burden of proof.  (2 RT 36-37.)

      After the court completed its routine background questions, both counsel conducted voir dire.  The prosecutor questioned whether any of the jurors had a problem rendering a verdict based on the testimony of a single witness.  (2 RT 117-20.)  Several jurors discussed their concerns.  (Id.)

      The prosecutor asked Juror No. 10 how she felt.  Juror No. 10 responded, "I was thinking [about] what the judge had said earlier, that you get what you get, but at the same time, just one person, it depends on if they are credible when you are listening to the evidence and examining what they say, and then you make your decision based on that.  Because she did indicate that you get what you get, if it is one witness, two witnesses, three, that is what you have to base your decision on."  (2 RT 119.)  The prosecutor probed further, trying to determine the juror's comfort level.  Juror No. 10 said, "I can be impartial.  I can listen to the testimony and determine I guess based on what they present and determine if it is credible."  (Id.)

      The prosecutor asked, "if you find the witness to be credible would you hesitate … to vote guilty?"  (2 RT 119-20.)  Juror No. 10 answered, "If the witness is credible and the defendant decides for whatever reason not to take the stand or whatever, it would be tough but based on the information that I received, yes, and it is credible."  (2 RT 120.)  In response to further questioning, Juror No. 10 twice indicated that she would vote "not guilty" if there was "any" doubt in her mind.  (Id.)  When the prosecutor explained that the correct standard was "beyond a reasonable doubt," she stated that she was "okay" with that standard.  (Id.)

      The prosecutor used a total of eight peremptory challenges.  He excused Jurors Nos. 2, 4, 9, 11, 17 (who had been re-seated as juror 11), 19 (who had been re-seated as juror 11), 20 (who had been re-seated as juror 11), and 10, in that order.[3]  (2 RT 125-27.)

---

[3] The Court of Appeal initially stated that the prosecutor exercised a total of seven peremptory challenges and provided a list that omitted Juror No. 17.  (LD 6

Juror No. 2 testified that she was friends with a woman who was "attacked and killed up in Topanga." (2 RT 97.) When asked about being uncomfortable convicting on the strength of one witness's testimony, she testified that if the one witness was a police officer, then she might "question" the testimony if it seemed like "pat" or "schooled" answers. (2 RT 116-17.)

Juror No. 4 was an apartment building manager. (2 RT 44.) He lived with his girlfriend whose brother was a police officer. (2 RT 82.)

Juror No. 9 testified that he would have "somewhat" of a problem convicting based on one witness's testimony, because that one witness "could say anything they want" and "it just seems like it is his word against another persons's word." (2 RT 117-18.) Juror No. 9 concluded, "Just one person doesn't seem valid enough." (2 RT 118.)

Juror No. 11 testified that he had been wrongfully arrested and had "little faith" in the judicial system. (2 RT 76-77.) He added, "It is just hard to base a lot of what is going on on one person's testimony when you are dealing with somebody's life." (2 RT 118.)

Juror No. 17 testified, "I don't think sometimes one person would be enough to prosecute somebody." (2 RT 121.)

Juror No. 19 testified that he had worked as a psychologist with inmates at Atascadero State Hospital. (2 RT 89-90.) He added, "I would be reluctant [to convict] if you have only a single witness." (2 RT 121.)

Juror No. 20 testified, "I don't know if I could be content with one witness." (2 RT 121.) He/she explained that it would be easier to convict based on one witness if the charges were less serious. (2 RT 121-22.)

After the prosecutor excused Juror No. 10, defense counsel objected, "Your

_____

at 7.) In discussing the testimony of the other dismissed jurors, however, the Court of Appeal correctly discussed all eight dismissed jurors. (Id. at 17.)

honor, this is the second African American, the only other African American in the box that counsel has dismissed, and I see there is nothing he[4] has said or done that would indicate, well, based on that I believe that counsel has made a race-based peremptory challenge." (2 RT 128.)

The trial court asked the prosecutor for a response, and he "state[d] for the record that the defendant is not Black, he is Hispanic." (Id.) The court told the prosecutor to continue, and he explained "this is a case where the People honestly only have one witness to the attack and [Juror No. 10] expressed a lot of hesitancy as to being able to form her opinion based on one witness. I have [dismissed] other races, whether or not they are White or Hispanic or Black because they were hesitant on that one subject." (Id.) The court responded that "in my notes there were some issues with respect to the one witness scenario. The court doesn't have a prima facie Wheeler [case]." (Id.)

### 3. The Court of Appeal's Opinion.

The California Court of Appeal explained, "[Petitioner] submits we should review this case through the lens of a first stage/third stage Batson/Wheeler hybrid. We agree with the approach, but not with the relief [Petitioner] seeks." (LD 6 at 5.) The court went on to reject Petitioner's Batson/Wheeler claim, reasoning as follows:

*[Petitioner] claims the prosecutor's justification for excusing Juror No. 10 was pretextual, or as he states it, "a sham." The facts show otherwise. To begin, the prosecutor's justification for excusing Juror No. 10 was race neutral. (See Briggs v. Grounds (9th Cir. 2012) 682 F.3d 1165, 1175 [juror properly excused where, among other things, she "suggested that she would hesitate to convict on the*

---

[4] At trial, defense counsel referred to Juror No. 10 as male. The prosecutor referred to Juror No. 10 as female. (2 RT 128.) The Court of Appeal referred to Juror 10 as female without resolving the conflict, because "gender is not at issue." (LD 6 at n. 5.) For consistency, this Court will also refer to Juror 10 as female.

*word of one witness alone"].)  Juror No. 10 stated it "would be tough" for her to render a verdict in a single witness case.  As such, the prosecutor correctly noted she "expressed a lot of hesitancy as to being able to form her opinion based on one witness."  This was a reasonable explanation given the circumstances of the case.  (See People v. Jones, supra, 51 Cal.4th at p. 360.)  There was nothing "'implausible or fantastic'" about the prosecutor's explanation.  (People v. Reynoso, supra, 31 Cal.4th at p. 916, quoting Purkett v. Elem, supra, 514 U.S. at p. 768.)  Here, the prosecutor's stated reasons are "'"both inherently plausible and supported by the record."'"  (People v. Long (2010) 189 Cal.App.4th 826, 842, 117 Cal. Rptr. 3d 451; accord, People v. Mai (2013) 57 Cal.4th 986, 1054, 161 Cal. Rptr. 3d 1, 305 P.3d 1175.)*

*The prosecutor's explanation also had a basis in trial strategy.  Because the case turned, in large part, upon the testimony of a single witness, the prosecutor's trial strategy would naturally be to find jurors who could base their decision on the testimony of a single witness.  (See People v. Avila (2009) 46 Cal.4th 680, 703, 94 Cal. Rptr. 3d 699, 208 P.3d 634 ["'the testimony of a single witness is sufficient for the proof of any fact'"]; see also CALCRIM No. 301.)  Jurors that would have trouble doing so would be the focus of peremptory challenges.*

*We similarly find no error in the court's implicit determination of credibility.  The prosecutor did not engage in a desultory examination of Juror No. 10.  (People v. Parker (2017) 2 Cal.5th 1184, 1211-1212, 218 Cal. Rptr. 3d 315, 395 P.3d 208.)  In fact, the prosecutor examined Juror No. 10's thoughts and feelings on the subject of a single witness case.  The prosecutor's conclusion that Juror No. 10 would have a "very hard time" in deciding a case with only one witness was amply supported by the record.*

*While the court's colloquy with the prosecutor was brief, it was, nonetheless, "'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'"  (Gutierrez, supra, 2 Cal.5th at p. 1159.)  No doubt because the court*

13

*found defense counsel had failed to make a prima facie case, its inquiry was*
*necessarily limited. But that does not mean it was not a sincere and reasoned effort*
*to evaluate the nondiscriminatory justifications offered. Not only did the trial court*
*see and hear the voir dire of Juror No. 10, but the court also reviewed its own notes*
*to corroborate the validity of the basis for the prosecutor's peremptory challenge.*
*A sincere and reasoned effort to evaluate a nondiscriminatory reason is not*
*tethered to the time it takes to make the determination, but rather to the nature of*
*the inquiry and assessment of the reasons at issue. (See People v. Mai, supra, 57*
*Cal.4th at pp. 1053-1054 ["terse ruling" not incompatible with sincere and*
*reasoned effort to evaluate prosecutor's reasons where those reasons were*
*plausible and supported by the record].)*

     *Finally, a review by comparative juror analysis demonstrates convincingly*
*the sincerity of the prosecution's justification for the excusal of Juror No. 10. [FN*
*9 omitted.] In fact, out of the prior six jurors excused by the prosecutor, five of*
*them identified their reluctance and skepticism to reach a verdict in a case*
*involving a single witness. [FN 10: Juror No. 4 was the only juror excused who did*
*not raise an issue concerning his or her ability to make a determination based upon*
*the testimony of only one witness. Defense counsel did not make any comments or*
*raise any issues concerning the basis for the prosecution's peremptory challenge of*
*Juror No. 4.] The comparative juror analysis reveals:*

     *Juror No. 2 expressed uncertainty as to whether he could believe a single*
*police officer who appeared to be giving a "pat answer."*

     *Juror No. 9 expressed skepticism about deciding a case based on a single*
*witness because a witness could say anything he or she wanted and may have*
*unknown biases. The juror expressed concern that "[j]ust one person doesn't seem*
*valid enough."*

     *Juror No. 11 agreed with Juror No. 9 and stated: "To add onto [sic] that, in*
*a lot of situations if there is a substantial amount of evidence or if there is not, it is*

just hard to base a lot of what is going on [in] one person's testimony when you are dealing with someone's life." *(Italics added.)*

Similarly, Juror No. 17 said, "I don't think sometimes one person would be enough to prosecute somebody."

Juror No. 19 stated, "I would be reluctant if you only have a single eyewitness." *(Italics added.)*

Juror No. 20 said, "I think I would have a little problem with that witness, the severity of it. I don't know if I could be content with one witness."

The prosecutor excused all of these jurors, and as he pointed out, it was not based on race. "I have [dismissed] other races, whether or not they are White or Hispanic or Black ...." Although the race of each of the excused jurors is unknown and the record is silent in this regard, six of the seven jurors excused by the prosecutor (including Juror No. 10) shared this common characteristic: the hesitancy to convict in a case involving a single witness.

Against this record, [Petitioner's] effort to show "'it was more likely than not that the challenge was improperly motivated'" is not persuasive. (*People v. Mai, supra*, 57 Cal.4th at p. 1059.) [Petitioner] makes two arguments. First, [Petitioner] argues the prosecutor's challenge was neither sincere nor plausible because at the outset of the *Batson/Wheeler* motion the prosecutor observed [Petitioner] is Hispanic and the challenged jurors are African-Americans. This comment has nothing to do with the basis for the juror's exclusion. Rather it reflects a preliminary concern over the cognizability for making a *Batson/Wheeler* motion. [FN 11 omitted.]

The only other point raised by [Petitioner] is that Juror No. 10 was the second and only other African American excused from the jury box. Statistical challenges involving one or two jurors who are a member of a cognizable group, standing alone, present the weakest possible evidence of impermissible exclusion. (*See People v. Parker, supra*, 2 Cal.5th at p. 1212 ["'"'[a]s a practical matter,

15

*however, the challenge of one or two jurors can rarely suggest a pattern of*

*impermissible exclusion'"'"];* <u>People v. Semien</u> *(2008) 162 Cal.App.4th 701, 708,*

*75 Cal. Rptr. 3d 880 [same].) [FN 12: While defense counsel stated Juror No. 10*

*was the second African American excluded from the panel, neither counsel nor the*

*court identified the other African American juror.  Nor did defense counsel make a*

<u>Batson/Wheeler</u> *challenge with respect to the dismissal of this unidentified juror.]*

  *In* <u>People v. Long</u>, <u>supra</u>, *189 Cal.App.4th 826, on which [Petitioner] relies,*

*the prosecutor claimed to have excused a juror based on his nonparticipation in a*

*discussion, lack of eye contact, body language, and the way he expressed himself.*

*The trial court accepted this explanation as legitimate, even though the record*

*revealed the claim that the juror did not participate in the discussion was*

*"demonstrably false."  (*<u>Id.</u> *at p. 843.)  On appeal, the court cautioned: "We do not*

*expect trial judges to provide a continuous recorded narrative during jury voir dire*

*of the appearance, behavior, and intonation of each prospective juror.  However,*

*when the prosecutor bases a peremptory challenge on an unrecorded aspect of a*

*prospective juror's appearance or behavior, we must and will look for some*

*support in the record for the prosecutor's observation."  (*<u>People v. Long</u>, <u>supra</u>,

*189 Cal.App.4th at p. 848.)  In the case before it, the record was "devoid of any*

*mention, let alone description, by the trial judge or the prosecutor of what was*

*disturbing or unseemly about [the juror's] body language or his way of expressing*

*himself.  [The court was] unable to extend normal deference to the trial court's*

*implied finding on this point when another stated reason, though pronounced*

*'legitimate' by the trial court, was demonstrably inaccurate."  (*<u>Ibid.</u>*)  The court*

*concluded "that the trial court erred in accepting the prosecutor's virtually*

*unverifiable and unverified explanation for challenging" the juror.  (*<u>Ibid.</u>

  *Here, by contrast, the trial court's own notes corroborated the same*

*concerns expressed by the prosecutor.  The record similarly supports the*

*prosecutor's observations and the legitimacy of the prosecutor's concern.  There*

16

*are no contradictions with respect to the prosecutor's explanations.*

*On this record, there is no basis to conclude the prosecutor's offered justification was implausible, untrue or a "sham." We find that the prosecutor's non-discriminatory reason for excusing Juror No. 10 was fully supported by the record, reasonable, based on legitimate trial concerns, and credible. Accordingly, the trial court did not err in denying [Petitioner's] Batson/Wheeler motion.*

(LD 6 at 14-20.)

### 4. The Court of Appeal Reasonably Rejected Petitioner's Claim.

When federal courts apply the deferential AEDPA standard in the Batson context, the resulting standard of review that is "doubly deferential," because the federal court defers to the state reviewing court's determination of the facts, and the reviewing court defers to the trial court's determination of the prosecutor's credibility. Sifuentes v. Brazelton, 825 F.3d 506, 518 (9th Cir. 2016). This doubly deferential standard means that "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." Id. (citing Briggs v. Grounds, 682 F.3d 1165, 1170 (9th Cir. 2012)).

Federal courts apply this doubly deferential standard in two steps. Jamerson v. Runnels, 713 F.3d 1218, 1225 (9th Cir. 2013). First, because § 2254(d)(2) ultimately requires a determination of whether the state court's decision was "based on an unreasonable determination of the facts in light of the evidence" in the record, courts must review the relevant portions of the record and use ordinary analytic tools to evaluate the prosecutor's race-neutral explanations. Mitleider v. Hall, 391 F.3d 1039, 1046-47 (9th Cir. 2004). District courts should consider whether a prosecutor's justifications are contrary to the evidence in the record, such as being "implausible or fantastic," Purkett, 514 U.S. at 768, based on mischaracterizations of a prospective juror's testimony, Miller-El II, 545 U.S. at 244, or belied by a comparative juror analysis. Conversely, courts should also consider whether

1    evidence in the record shows that at least some of the prosecutor's reasons were

2    "permissible and plausible." Rice v. Collins, 546 U.S. 333, 341 (2006).

3           Second, having reviewed the prosecutor's explanations in light of the

4    evidence in the record, courts must turn to the state appellate court's decision.

5    Sifuentes, 825 F.3d at 518. The pertinent question is not whether the prosecutor

6    was credible, or even whether the trial court's conclusion to that effect was clearly

7    erroneous. Rather, the pertinent question is "whether the state appellate court was

8    objectively unreasonable in upholding the trial court's determination." Id. Even if

9    the reviewing court would have reached a different conclusion regarding the

10   prosecutor's credibility, it must give the state appellate court the benefit of the

11   doubt, and it may not grant the habeas petition unless the state court's decision was

12   "not merely wrong, but actually unreasonable." Id. (citing Taylor v. Maddox, 366

13   F.3d 992, 999 (9th Cir. 2004)).

14          Per the first step of this two-step analysis, this Court summarized above the

15   relevant evidence. The Court of Appeal did not mischaracterize Juror No. 10's

16   testimony. She qualified the answer with "I guess" and stated that it would be

17   "tough" for her to convict based on one credible witness. (2 RT 120.) The Court of

18   Appeal similarly did not mischaracterize the testimony of the other prospective

19   jurors dismissed by the prosecutor's peremptory challenges. Juror Nos. 2, 9, 11,

20   17, 19, and 20 all similarly indicated reluctance to convict based on the testimony

21   of one witness. (2 RT 116-18, 121.)

22          At step two, the prosecution's case relied heavily on the testimony of one

23   witness: the victim Ramirez. Thus, the state court did not act unreasonably in

24   finding credible the prosecutor's race-neutral reason for dismissing Juror No. 10.[5]

25           [5] A 2015 Eastern District of California case concluded that, in similar

26   circumstances, district courts should address on de novo review whether the
     defendant established a prima facie case of discrimination. See Kattan v. Bowen,

27   No. 2:13-CV-00624-JKS, 2015 WL 4132588, at *8 (E.D. Cal. July 9, 2015); see

28   also Pardue v. Montgomery, No. 2:14-CV-02255-JKS, 2016 WL 958199, at *9

1  Petitioner is not entitled to relief on his <u>Batson/Wheeler</u> claim.

2  **B.    Ground Two: Insufficient Evidence of Intent to Maim.**

3      Petitioner argues that his conviction for aggravated mayhem is

4  unconstitutional because there is insufficient evidence that "he harbored the

5  requisite specific intent to main." (Dkt. 1 at 28.) He argues that, at worst, the

6  evidence suggests "an indiscriminate intent to cause a significant injury," because

7  the assailant did not target Ramirez's face, inflicted only a single stab wound, and

8  no medical evidence established the disfiguring effect of the wound. (<u>Id.</u> at 28, 30.)

9      **1. Relevant Trial Court Proceedings.**

10      The jury was instructed that aggravated mayhem is a "specific intent" crime,

11  and to be guilty of such a crime, a defendant must "not only intentionally

12  committee the prohibited act, but must do so with specific intent and or mental

13  state." (CT 78.) The jury was further instructed pursuant to CALCRIM No. 800,

14  as follows:

15          The defendant is charged in Count two with aggravated

16      mayhem …. [¶] To prove that the defendant is guilty of this crime,

17      the People must prove that:

18          1. The defendant unlawfully and maliciously disabled or

19      disfigured someone permanently;

20          2. When the defendant acted, he intended to permanently

21      disable or disfigure the other person; [¶] AND

22          3. Under the circumstances, the defendant's act showed extreme

23      indifference to the physical or psychological well-being of the other

24      person.

25  _____

26  (E.D. Cal. Mar. 8, 2016) (same approach). Were the Court to follow this approach, it would conclude that Petitioner did not make a prima facie case of discrimination.

27  The totality of the circumstances raises no inference that the strike was based on race.

28

1        Someone acts maliciously when he intentionally does a

2    wrongful act or when he acts with the unlawful intent to annoy or

3    injure someone else.  [¶]  A disfiguring injury may be permanent even

4    if it can be repaired by medical procedures.  [¶]  The People do not

5    have to prove that the defendant intended to kill.

6    (CT 82.)

7        **2.  The Court of Appeal's Opinion.**

8        The Court of Appeal described the elements of aggravated mayhem under

9    California law and distinguished Petitioner's case from the "indiscriminate attack"

10   cases that he cited in his briefing, as follows:

11       *Aggravated mayhem is "a specific intent crime, such that conviction requires*

12   *proof beyond a reasonable doubt 'that the defendant acted with the specific intent*

13   *to cause a maiming injury.' [Citation.]"  (*<u>People v. Manibusan</u>* (2013) 58 Cal.4th*

14   *40, 86, 165 Cal. Rptr. 3d 1, 314 P.3d 1; <u>People v. Quintero</u> (2006) 135 Cal.App.4th*

15   *1152, 1162, 37 Cal. Rptr. 3d 884.)  "'Furthermore, specific intent to maim may not*

16   *be inferred solely from evidence that the injury inflicted actually constitutes*

17   *mayhem; instead, there must be other facts and circumstances which support an*

18   *inference of intent to maim rather than to attack indiscriminately. [Citation.]'*

19   *[Citation.]"  (<u>People v. Park</u> (2003) 112 Cal.App.4th 61, 64, 4 Cal. Rptr. 3d 815.)*

20   *Specific intent may be inferred, however, from the circumstances of the offense,*

21   *including the nature and location of the injuries.  (See <u>Quintero</u>, supra, at pp. 1162*

22   *["'[S]pecific intent may be inferred from the circumstances attending an act, the*

23   *manner in which it is done, and the means used, among other factors'"].)*

24       *For example, in <u>People v. Manibusan</u>, supra, 58 Cal.4th 40, the court noted*

25   *"the fact the victim was shot in the head can support an inference of an intent to*

26   *kill. [Citations.]  We now find that the same fact can support an inference of an*

27   *intent to cause permanent disability or disfigurement.  'It takes no special expertise*

28   *to know that [several shots fired at someone's head] from close range, if not fatal,*

20

*[are] highly likely to disable permanently.'''* (*Id.* at p. 88, quoting *People v. Ferrell* (1990) 218 Cal.App.3d 828, 835, 267 Cal. Rptr. 283.)

      *While Manibusan involved several shots to the face, Ferrell involved a single shot to the neck. In Ferrell, the appellant carried out a "cold and deliberate attack" on the victim, shooting her once in the neck from close range. (People v. Ferrell, supra, 218 Cal.App.3d at p. 835.) The court observed that "[o]nce [the victim] was down, appellant did not fire additional shots at her, to make certain that she was dead; instead, appellant was apparently satisfied with the result of her single shot. … Appellant's shooting of [the victim] was not an indiscriminate, random attack on her body; instead, the shooting was directed and controlled. From all this evidence, the jury could reasonably have inferred that appellant intended both to kill [the victim], and, if she did not die, to disable her permanently. Substantial evidence supports the jury's verdict." (Id. at pp. 835-836.)*

      *In People v. Szadziewicz (2008) 161 Cal.App.4th 823, 74 Cal. Rptr. 3d 416, the court was careful to point out that "'[e]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim." (Id. at p. 831, quoting People v. Quintero, supra, 135 Cal.App.4th at p. 1162.) In Szadziewicz, the victim was asleep in bed when the defendant entered his room, held him down on his bed and, in a controlled and directed manner, cut across his face from his temple to his nose. The defendant argued his intent was to burn or kill the victim, not to maim him. The court rejected this argument, stating that "an intent to burn [the victim] or even to kill him is not inherently incompatible with an intent to maim." (Szadziewicz, supra, at p. 833.) "'[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful.'" (Id. at p. 833, quoting, People v. Ferrell, supra, 218 Cal.App.3d at pp. 833-834.)*

      *[Petitioner] argues the method of the attack here, involving a single "stab" wound, reflects an intent to kill rather than an intent to maim. But one intent does*

not foreclose the other.  (See *People v. Szadziewicz*, *supra*, 161 Cal.App.4th at p. 834.)  Next, [Petitioner] argues because he did not target Ramirez's face but, instead, cut him once across the neck, the evidence is insufficient to demonstrate an intent to maim.  While [Petitioner] is correct Ramirez was gouged once in the neck, as opposed to multiple times, the numerical count, while a relevant factor for the jury's consideration, is not dispositive of intent.  (See, e.g., *People v. Lee* (1990) 220 Cal.App.3d 320, 325, 269 Cal. Rptr. 434.)

[Petitioner] looks to *People v. Lee*, *supra*, 220 Cal.App.3d 320, for support. *Lee* provides none.  In *Lee*, the defendant attacked the victim, punching him three times in the face and kicking him twice someplace on the body.  Finding insufficient evidence of the requisite intent, the court focused on the fact that Lee "did not shoot or stab his victim; instead, he used his fists and his feet."  (*Id.* at p. 326)  It found "[t]he evidence shows no more than a sudden, indiscriminate, and unfocused battering of [the victim's] body.  While this evidence undoubtedly shows extreme indifference to [the victim's] physical well being, it does not show a controlled, directed, limited attack … from which a jury could reasonably have inferred that [the] defendant specifically intended to disable [the victim] permanently."  (*Ibid.*)

[Petitioner] also cites *People v. Anderson* (1965) 63 Cal.2d 351, 46 Cal. Rptr. 763, 406 P.2d 43.  In *Anderson*, the California Supreme Court reversed a conviction for murder in the perpetration of mayhem finding insufficient evidence. Anderson was charged with the murder of a 10-year-old girl.  In addition to evidence of sexual misconduct and testimony concerning the defendant's unconsciousness, epilepsy, intoxication and diminished capacity, the mortician testified there were over 41 wounds ranging over the entire body, as well as over 20 more superficial cuts.  The high court stated, "[t]he evidence does no more than indicate an indiscriminate attack; it cannot independently uphold a verdict based on the precise premise that [the] defendant entertained the specific intent to commit mayhem."  (*Id.* at p. 359.)  Although the court did not explain its ruling,

1  *presumably the indiscriminate, unfocused and explosive nature of the attack*
2  *precluded a finding of specific intent to maim.*

3      *Our facts are very different from those in* <u>Lee</u> *and* <u>Anderson</u>, *and far closer*
4  *to those in* <u>Manibusan</u>, <u>Ferrell</u> *and* <u>Szadziewicz</u>. *Here, [Petitioner] carried out a*
5  *"cold and deliberate attack" on Ramirez.  (*<u>People v. Ferrell</u>, <u>supra</u>, 218
6  *Cal.App.3d at p. 835.)  [Petitioner] selected the serrated side of the knife blade and*
7  *cut Ramirez's neck while Ramirez lay in bed sleeping, with his back to [Petitioner].*
8  *[Petitioner] did not simply puncture or stab Ramirez's neck.  He gouged Ramirez's*
9  *neck, leaving a "big ol' gap."  [Petitioner's] acts were controlled, directed and*
10 *limited in scope.  (*<u>People v. Szadziewicz</u>, <u>supra</u>, 161 Cal.App.4th at p. 831.)  At the*
11 *time of the preliminary hearing, which took place on August 15, 2014, roughly*
12 *three months after the incident, Ramirez still had one staple in his neck.  He had "a*
13 *three- to four-inch scar on the left side of the throat below the jawline."  The jury*
14 *saw the photographs of Ramirez's injuries.  Cutting a three- to four-inch gash in*
15 *someone's neck with a serrated knife, if not fatal, is highly likely to disfigure or*
16 *disable someone permanently.  It is reasonably inferable from the nature of the*
17 *attack and the wound that [Petitioner] did not merely intend to injure Ramirez, but*
18 *intended "'to cause a maiming injury.'"  (*<u>People v. Manibusan</u>, <u>supra</u>, 58 Cal.4th*
19 *at p. 86.)  From this evidence a reasonable jury could find that [Petitioner] acted*
20 *with the intent to permanently disable or disfigure Ramirez.*
21 (LD 6 at 22-26.)

22      **3.  Relevant Federal Law.**

23      The Due Process Clause of the Fourteenth Amendment protects a criminal
24 defendant from conviction "except upon proof beyond a reasonable doubt of every
25 fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>,
26 397 U.S. 358, 364 (1970); accord <u>Juan H. v Allen</u>, 408 F.3d 1262, 1274 (2005).
27 Thus, a state prisoner who alleges that the evidence introduced at trial was
28 insufficient to support the jury's findings states a cognizable federal habeas claim.

Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The petitioner, however, faces a "heavy burden" to prevail on such a claim.  Juan H., 408 F.3d at 1274.  Evidence is sufficient to support a conviction if, viewing all the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Coleman v. Johnson, 566 U.S. 650, 656 (2012) (per curiam) ("the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality").

"[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  Parker v. Matthews, 567 U.S. 37, 43 (2012) (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (Court of Appeal erred by substituting its judgment for that of California jury as to which side's expert witnesses more persuasively explained cause of death)).  The reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995); see also Jackson, 443 U.S. at 319, 324, 326.

In post-AEDPA cases, where, as here, a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" Jackson, a reviewing federal court applies an additional layer of deference.  Juan H., 408 F.3d at 1274.  "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable."  Cavazos, 565 U.S. at 4; see also Juan H., 408 F.3d at 1275 n.13.  This "double dose of deference … can rarely be surmounted."  Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011); see also Coleman, 566 U.S. at 651 ("We have made clear that Jackson claims face a

1  high bar in federal habeas proceedings because they are subject to two layers of

2  judicial deference"). Thus, a state court's resolution of an insufficiency of the

3  evidence claim is evaluated under 28 U.S.C. § 2254(d)(1), not § 2254(d)(2).

4      In adjudicating an insufficiency of the evidence claim, a federal habeas court

5  "look[s] to [state] law only to establish the elements of [the crime] and then turn[s]

6  to the federal question of whether the [state court] was objectively unreasonable in

7  concluding that sufficient evidence supported [the conviction]." <u>Juan H.</u>, 408 F.3d

8  at 1278 n.14. In determining whether the evidence was sufficient, a federal court

9  must follow the California courts' interpretation of state law. <u>Bradshaw v. Richey</u>,

10  546 U.S. 74, 76 (2005).

11      **4.  The Court of Appeal Reasonably Rejected Petitioner's Claim.**

12      Evidence of intent is usually circumstantial and must be inferred from the

13  defendant's actions and other circumstances surrounding the crime. Here, the

14  evidence established that Petitioner had been with Ramirez the night before and

15  gotten angry about a picture of "his girl" on a cellphone; the next day, he went to

16  see Ramirez at Ramirez's home, waited until Ramirez lay down to nap, and then

17  used a convenient knife to cut a three or four inch gash in Ramirez's neck. (CT 5-

18  15.) As the Court of Appeal noted, "Cutting a three- to four-inch gash in

19  someone's neck with a serrated knife, if not fatal, is highly likely to disfigure or

20  disable someone permanently." (LD 6 at 25.) Thus, the Court of Appeal

21  reasonably concluded that Petitioner's actions and the circumstances of the crime

22  provided sufficient evidence for the jury to find that Petitioner intended to disfigure

23  or disable Ramirez permanently.

24  **C.  <u>Ground Three: Insufficient Evidence of the Assailant's Identity.</u>**

25      Petitioner argues that his conviction is unconstitutional because there was

26  insufficient evidence for the jury to find beyond a reasonable doubt that he stabbed

27  Ramirez. (Dkt. 1 at 32.) "When evidence of identity is so weak as to constitute no

28

evidence at all, the verdict should be set aside." (Id. at 34.)

### 1. Relevant Trial Court Proceedings.

At the preliminary hearing, Ramirez testified that he received a wound to the left side of his neck on May 24, 2014, while in bed. (CT 4-5.) He testified that he heard a knock at his door, let a man he knew as "Jose" or "Wicked" come in, advised that he was going back to sleep, and gave "Jose" the key code to his phone. (CT 5-7.) In court, he identified "Jose" as Petitioner. (CT 9.) After Petitioner entered, they were the only two people in the room. (CT 6.) He did not see Petitioner do anything, because he was lying on his right side on a cot, facing the wall. (CT 7, 14.) He was trying to sleep but not sleeping. (CT 14.) He kept a knife on top of the dresser next to the bed. (CT 11, 14.) He never saw the knife in Petitioner's hands, but it was missing after he was stabbed. (CT 15.)

Ramirez testified, "Next thing I know, I feel a pinch and a gouge and look up and see him going out the door." (CT 5.) Ramirez also testified that the first thing he did after feeling the gouge to his neck was "looked up" to "see what was going on." (CT 16.) He saw Petitioner "by the door getting ready to go out with this just wild crazed look in his eye …." (Id.) He described it as the same look that his brother with "mental problems" sometimes had. (Id.) They did not exchange any words. (Id.) After Petitioner left, Ramirez got up to look at his neck in the mirror. (Id.)

Just the night before, Ramirez had socialized with Petitioner. (CT 8-9.) They discussed some photographs on a cellphone belonging to "another individual that was there." (CT 9.) There was a photograph of "a neighbor girl that was like bending over" and when Petitioner saw it, "he shouts out, 'That's my girl!'" (Id.)

At trial, the prosecutor read Ramirez's preliminary hearing testimony into evidence. (3 RT 402-18.)

Ramirez was living in a detached garage converted into a bedroom. (3 RT 339.) The garage had only one entrance. (Id.) The People introduced pictures of

the garage's interior.  (3 RT 340.)

## 2. The Court of Appeal's Opinion.

The California Court of Appeal rejected Petitioner's insufficient identification evidence claim, as follows:

*[Petitioner] argues the evidence is insufficient to establish his identity as the assailant, in that "[t]he only witness to the stabbing, Ramirez, did not see who stabbed him, did not see [him] holding a knife, and never saw what knife stabbed him."  Although [Petitioner] acknowledges that "Ramirez testified [he] was the only other person in the room with him," he argues that "a second man, Rubin, left 30 seconds earlier.  [Ramirez] was napping with his back to the door, so Rubin or someone else could have assaulted Ramirez.  ...  There was no direct evidence [Petitioner] stabbed Ramirez.  The circumstantial evidence did not amount to substantial evidence, and reversal is necessary."[6]*

*The evidence leaves little room for doubt that [Petitioner] was the perpetrator.  Ramirez testified Rubin left 30 seconds before [Petitioner] arrived at his home.  Ramirez let [Petitioner] inside.  [Petitioner] "kicked back" and used Ramirez's cell phone while Ramirez tried to go back to sleep.  [Petitioner] was the only other person in the room.  Ramirez felt a gouge in his neck, looked up and saw [Petitioner] with a wild and crazy look in his eyes.  [Petitioner] left immediately. Circumstantial evidence was similarly corroborative.  Ramirez's cell phone was discovered inside [Petitioner's] residence.*

*[Petitioner] argues that because Ramirez did not actually see the assailant cut his neck, there is a possibility Rubin or someone else committed the attack. This argument lacks merit.  So long as "the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [citations omitted]*

---

[6] This quotation is from LD 3 at 22.

1  (*People v. Clark* (2011) 52 Cal.4th 856, 945, 131 Cal. Rptr. 3d 225, 261 P.3d 243.)

2       *Viewed in the light most favorable to the prosecution (*People v. Zamudio,*

3  *supra, 43 Cal.4th at p. 357), the evidence reasonably supports the jury's verdict.*

4  (LD 6 at 26-27.)

5            **3.  The Court of Appeal Reasonably Rejected Petitioner's Claim.**

6       Petitioner argues that a reasonable, alternative theory consistent with the

7  evidence is that someone else came into the room and stabbed Ramirez.  This

8  argument ignores Ramirez's testimony.  Ramirez testified that after letting

9  Petitioner enter, they were the only two people in the garage.  (CT 6.)  Ramirez lay

10  down to try to sleep, but he did not fall asleep in the approximately five to seven

11  minutes that elapsed between Petitioner's arrival and the attack.  (CT 14.)  He did

12  not testify that he heard anything unusual during these minutes, such as someone

13  else entering the room.  (CT 5-15.)  He testified that immediately upon feeling a

14  gouge in his neck, he looked up and saw that Petitioner was still in the room;

15  Petitioner was close to the door with a "crazed" look, and no one else was in the

16  room.  (CT 6, 16.)  At that point, Ramirez was bleeding, because he left blood on

17  his pillow which was later photographed.  (3 RT 341.)  According to Ramirez,

18  however, Petitioner left rather than staying to help him or identify the assailant, as

19  one might have expected if Petitioner had just seen someone else enter the room

20  and stab his friend.  When Petitioner left, he took Ramirez's cellphone, which

21  authorities found at Petitioner's residence.  (3 RT 388-89.)  Considered together,

22  the Court of Appeal reasonably concluded that this evidence – while lacking an

23  eyewitness account of the actual stabbing – was sufficient for a jury to find beyond

24  a reasonable doubt that Petitioner was the person who attacked Ramirez.

25  **D.    Ground Four: Prosecutorial Misconduct.**

26            **1.  Relevant Trial Court Proceedings.**

27       After deliberating for half a day, the jury sent the court a note requesting

28  "[a]dvice and direction on how to proceed due to the unlikelihood of a unanimous

                                      28

decision." (3 RT 902.)  The court told counsel it was "inclined to get the jurors out and ask them if they would prefer to have additional instructions, if they want us to clarify previous instructions, if they want to ask or if they would like to hear further argument on behalf of counsel.  Then if that is not enough, the court is going to suggest to them … that we will ask both the majority and the dissenting jurors to reconsider their positions, and we'll ask them to engage in reverse role playing in order to better understand each other's position." (<u>Id.</u>)  Neither the prosecutor nor defense counsel objected to the court's proposed procedure.

The court brought the jury in and asked the foreperson if the jurors were "open to some advice and direction." (3 RT 904.)  The foreperson said they were. (<u>Id.</u>)  The court asked if clarifying instructions would assist the jury. (<u>Id.</u>)  The foreperson responded, "Perhaps.  It feels like we have some immovable objects on polar opposites." (<u>Id.</u>)  The court asked if permitting counsel to give further argument would help.  The foreperson thought it could. (3 RT 905.)

The court then advised the foreperson "to ask both the majority and the dissenting jurors to reconsider their positions, and then, that the jurors engage in reverse role-playing in order to better understand each other's positions." (<u>Id.</u>)  The foreperson thought the jury could do that, adding, "I think we've been doing a lot of that already." (<u>Id.</u>)

The court asked the foreperson to identify the subject matter of the issues for re-argument.  Juror No. 11 stated, "[p]robably, it would be the premeditation aspect." (3 RT 907.)  Juror No. 4 asked for Ramirez's "testimony, not his testimony specifically, but what he says about the defendant, seeing the defendant after the crime was committed." (<u>Id.</u>)

Defense counsel argued first. (3 RT 909-12.)  He discussed the concept of premeditation and argued that the jury had to determine the identification of the perpetrator based upon the facts presented. (<u>Id.</u>)

The prosecutor went next.  "First, procedurally, I wanted to make it

abundantly clear that count 1 [attempted murder] and count 2 [aggravated mayhem] are completely separate counts. So you could find him guilty on count 1 and not guilty on count 2." (3 RT 912.) Defense counsel objected on the grounds the argument was beyond the scope of the jury's question. (Id.) The trial court overruled the objection. (Id.) The prosecutor continued to argue that the jury could find the defendant "guilty of count 2 independently of count 1. All right. So they are separate counts that have to be decided separately." (3 RT 913.)

The prosecutor discussed the jury's consideration of the different counts and the differences between reaching a verdict and making findings on the special allegations. The prosecutor stated: "Now, so that I just want that to be clear[,] because if the jury is hung only on the allegation of premeditation or deliberations, then you must have already found him guilty of the attempted murder. The attempted murder has nothing to do with premeditation and deliberation. Attempted murder is simply an attempt to kill followed by an act that is a direct step to kill." (Id.)

Defense counsel objected to "counsel's statement that they have already found him guilty of anything." (Id.) The court responded, "[H]e is presenting a hypothetical. Overruled." (Id.)

The prosecutor went on to discuss the concept of premeditation. In so doing, he presented the jury with a hypothetical: "Now, let me give you a hypothetical scenario to help distinguish the concepts of mere intent to kill an[d] attempted murder and one that is premeditated, one that is deliberated over, one that is willful. Imagine this scenario, you go to a bar. You are a carpenter, okay. You carry one of those carpenter knives on you as you work. You just got off work. You go to a bar. You go with your girlfriend. You are at the bar. You sit down to have a drink. You have a few drinks. Your girlfriend has a few drinks. Some random guy walks up and starts talking to your girl, asking her for her number. This just gets you very upset and without really considering the consequences of what you are going to do,

30

you pull that knife out of your pocket and you stab the guy who is hitting on your girlfriend." (3 RT 915.) There was no objection to the prosecutor's use of this hypothetical.

As the prosecutor reached the end of his argument, he told the jury: "If there are further questions that you need from us or clarity, then you can ask us, and we'll be happy to readdress them, but once again, I want to make it abundantly clear that the counts, attempted murder and mayhem, that is where you have the guilty or not guilty, and then the allegations are separate. Those aren't necessarily verdicts. Those are allegations that you find true or not true, and you could be hung, whatever, 6/6 on the allegation of premeditation or on [great bodily injury] or on the use of the knife. Any of the allegations you guys could be having trouble with, that doesn't mean you haven't reached your verdict as to one or both of the counts …." (3 RT 919.) Defense counsel did not object.

### 2. The Court of Appeal's Opinion.

The California Court of Appeal rejected Petitioner's prosecutorial misconduct claim, as follows:

> *[Petitioner] claims prosecutorial misconduct with respect to the following portions of the prosecutor's supplemental argument.*
>
> *a. Splitting the Verdict*
>
> *[Petitioner] claims the prosecutor encouraged the jurors to "split their verdict as a means of reaching a unanimous verdict," encouraging them "to convict on count 2 and acquit on count 1 as a means of reaching a verdict when the jury was split as what the fore[person] described as 'immovable objects on polar opposites.'"[7]*
>
> *The prosecutor told the jury counts 1 and 2 were separate counts, so the jury "could find [defendant] guilty on count 1 and not guilty on count 2," or it could*

_____

[7] This quotation is from LD 3 at 30.

*find defendant "guilty of count 2 independently of count 1. ... So they are separate*
*counts that have to be decided separately." The prosecutor did not tell the jurors*
*to resolve their deadlock by splitting the verdict and forsaking their views.*

*[Petitioner] also claims the prosecutor's discussion was a misstatement of*
*the law. It was not. The prosecutor properly pointed out that counts 1 and 2 were*
*separate counts and should be considered separately. (See CALCRIM No. 3515 –*
*Multiple Counts: Separate Offenses ["Each of the counts charged in this case is a*
*separate crime [except for Counts ___, which are charged as alternative*
*offenses."] Because the argument was not improper, it did not constitute*
*prosecutorial misconduct. (See People v. Chatman (2006) 38 Cal.4th 344, 387, 42*
*Cal. Rptr. 3d 621, 133 P.3d 534.)*

*b. Speculation Regarding the Jurors' Split*

*[Petitioner] argues "[i]t was also improper for the prosecutor to speculate*
*the jurors were split 6 to 6 on premeditation and deliberation, or split on the great*
*bodily injury or knife allegations, and to urge them to convict on attempted murder*
*and remain hung on the allegations." While it may be error to encourage the*
*jurors to consider their numerical division when continuing their deliberations,*
*pressuring the minority to reconsider their views in light of the majority's views*
*(People v. Gainer (1977) 19 Cal.3d 835, 852, 139 Cal. Rptr. 861, 566 P.2d 997,*
*disapproved on another ground in People v. Valdez (2012) 55 Cal.4th 82, 163, 144*
*Cal. Rptr. 3d 865, 281 P.3d 924; People v. Hinton, supra, 121 Cal.App.4th at p.*
*659), that is not what happened here. The prosecutor did not encourage the*
*minority to question their views in light of the majority's position or to abandon*
*their positions in order to resolve the case.*

*[Petitioner] cites People v. Hinton, supra, 121 Cal.App.4th 655 for support.*
*In Hinton, the trial court "instructed jurors holding a minority position to question*
*that position in light of the majority's view." The trial court told the jurors to*
*"'respect the majority opinion' and [they] should 'listen with proper deference to*

32

each other and should question their own judgment if a majority of the jurors take a different view of the case.'" (*Id.* at pp. 659-660.) None of these improprieties is present in our case.

The prosecutor's argument did not venture near the objectionable and coercive language found in the instructions given by the court in <u>Hinton</u>. Merely speculating that the jurors may be split six to six, without more, does not violate the proscription against jury coercion or discussion of "'majoritarian appeal.'" (<u>People v. Valdez</u>, <u>supra</u>, 55 Cal.4th at p. 161.)

Even if the prosecutor's argument could be interpreted as "urg[ing the jury] to convict on attempted murder and remain hung on the allegations," there was no prejudicial error. (<u>People v. Valdez</u>, <u>supra</u>, 55 Cal.4th at p. 164.) The jury acquitted defendant on the attempted murder charge, and the jury found true the weapon use and great bodily injury allegations with respect to the aggravated mayhem charge. It did not convict [Petitioner] on the charged offense and hang on the allegations in order to reach a compromise verdict.

c. The Hypothetical Conviction on Count One

[Petitioner] contends it was misconduct for the prosecutor to "argue the jury must have already found [him] guilty of attempted murder." The prosecutor argued, "if the jury is hung only on the allegation of premeditat[ion] or deliberation[], then you must have already found him guilty of the attempted murder." Defense counsel objected and the court overruled the objection stating, "[h]e is presenting a hypothetical."

[Petitioner] claims the argument was a comment on the numerical split of the jury. It was not. Placed in context, the argument presented a hypothetical to help illustrate the procedural context in which the jury should consider the special allegations. The argument did not comment upon the split of the jury. No error is found in this argument.

d. The Discussion of Premeditation

33

1     *Finally, [Petitioner] claims the prosecutor committed misconduct by using a*

2 *"hypothetical scenario to help distinguish the concepts of a mere intent to kill in*

3 *attempted murder and one that is premeditated, one that is deliberated over, one*

4 *that is willful." [Petitioner] tries to equate the hypothetical used in the present*

5 *case with prosecutorial arguments that inflame the passions of the jury by asking*

6 *the jury to put themselves in the shoes of the victim. [FN 15: [Petitioner's]*

7 *reference to People v. Vance (2010) 188 Cal.App.4th 1182 … demonstrates why*

8 *this contention fails. In Vance, the court condemned the prosecutor's "Golden*

9 *Rule" argument wherein the prosecutor urged the jurors to "'Walk in [the*

10 *Victim's] Shoes.'" (Id. at p. 1192-1193.) Here, the prosecutor did not make such*

11 *an argument. The prosecutor's reference to the hypothetical man in the bar does*

12 *not raise the same emotionally inflammatory concerns. Rather, the prosecutor's*

13 *argument was a discussion by hypothetical example on the topic of premeditation.]*

14 *But that is not what the prosecutor argued here. To the contrary, the prosecutor*

15 *used a hypothetical man to elucidate the concepts of premeditation. In any event,*

16 *as the jury acquitted [Petitioner] of attempted murder and the special allegations,*

17 *no possible prejudice resulted from this argument; hence, there was no*

18 *prosecutorial misconduct. (People v. Ochoa (1998) 19 Cal.4th 353, 432, 79 Cal.*

19 *Rptr. 2d 408, 966 P.2d 442.)*

20 (LD 6 at 32-36.)

21     **3. Clearly Established Federal Law.**

22     Federal habeas review of prosecutorial misconduct claims is limited to the

23 narrow issue of whether the alleged misconduct violated due process. <u>Donnelly v.</u>

24 <u>DeChristoforo</u>, 416 U.S. 637, 642 (1974); <u>Thompson v. Borg</u>, 74 F.3d 1571, 1576

25 (9th Cir. 1996). Misconduct is reviewed in light of the entire trial record, and relief

26 will be granted only if the misconduct so infected the trial with unfairness as to

27 make the resulting conviction a denial of due process. <u>Donnelly</u>, 416 U.S. at 639-

28 43. "[T]he touchstone of due process analysis in cases of alleged prosecutorial

misconduct is the fairness of the trial, not the culpability of the prosecutor." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982).

In assessing unfairness resulting from a prosecutor's comments, courts consider (1) whether the comment misstated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether the comment was invited by defense counsel; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the comment's prominence in the context of the entire trial; and (6) the weight of the evidence. <u>Hein v. Sullivan</u>, 601 F.3d 897, 912-13 (9th Cir. 2010) (citing <u>Darden v. Wainwright</u>, 477 U.S. 168, 182 (1986)).

### 4. The Court of Appeal Reasonably Rejected Petitioner's Claim.

The California Court of Appeal reasonably rejected Petitioner's claims of prosecutorial misconduct. Petitioner has not actually identified any misconduct, let alone misconduct that violated his right to due process. The prosecutor accurately stated the law that allowed the jury to find Petitioner guilty of count 2 and not count 1. Compare <u>Cal. Pen. Code</u> §§ 187(a), 664 (requiring intent to kill for attempted murder) <u>and</u> § 205 (requiring intent to cause permanent disability or disfigurement); CT 85-89 (verdict forms that did not require that jurors find Petitioner guilty of both or neither count); Cal Penal Code § 954.[8] The prosecutor did not improperly pressure a minority of the jurors to change their minds by hypothesizing that the jury was split equally. The prosecutor did not pressure the jury to convict on attempted murder and remain hung on the other counts; he simply stated that if the jury was "only" hung on the premeditation allegation, then the jury must have

---

[8] "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count."

found Petitioner guilty of attempted murder because attempted murder did not require premeditation (again, an accurate statement of the law). Indeed, since the jury did not find Petitioner guilty of attempted murder, the prosecution's comment could not have been prejudicial. Last, the prosecutor's premeditation hypothetical was not improper. The prosecutor did not urge the jury to walk in the victim's shoes. Rather, he presented a hypothetical to explain the difference between intent to kill and premeditation. This would not have infected the trial with unfairness.

### E.    <u>Evidentiary Hearing</u>

Petitioner requests an evidentiary hearing. (<u>See</u> Dkt. 16.) In habeas proceedings, an evidentiary hearing is required when the petitioner's allegations, if proven, would establish the right to relief. <u>See</u> <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998). An evidentiary hearing is not required on issues that can be resolved by reference to the state court record. <u>See</u> <u>Campbell v. Wood</u>, 18 F.3d 662, 679 (9th Cir. 1994). An evidentiary hearing is not warranted where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." <u>Schrirro v. Landrigan</u>, 550 U.S. 465, 474 (2007). Petitioner's claims can be resolved by reference to the state record, and Petitioner makes no allegations that establish any right to relief; he is therefore not entitled to an evidentiary hearing.

### VII.

### CONCLUSION

FOR THESE REASONS it is hereby ordered that Judgment be entered denying the Petition.


DATED:  <u>June 19, 2019</u>

_Karen E. Scott_

_____

KAREN E. SCOTT
United States Magistrate Judge